UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

AKEEM MUHAMMAD,

               Plaintiff,

v.                                    Case No. 3:16-cv-1436-MMH-PDB

JULIE JONES, et al.,

               Defendants.

_____

## **ORDER**

### I.    **Status**[1]

Plaintiff Akeem Muhammad, an inmate of the Florida penal system, is proceeding on a pro se Second Amended Civil Rights Complaint (Doc. 67; SAC) against Mark Inch, Secretary of the Florida Department of Corrections (FDOC) in his official capacity;[2] Julie Jones, former Secretary of the FDOC in her individual capacity; Thomas Reimers, Director of Health Services for the FDOC in his individual and official capacities; and Olugbenga Ogunsanwo, former Director of Medical and Mental Health Services for the FDOC in his individual capacity. Muhammad claims that Defendants have been

_____

[1] For all documents filed in this case, the Court cites to the page numbers as assigned by the Court's Electronic Case Filing System.

[2] At Defendants' request, the Court substituted Inch, in his official capacity, for Jones, in her official capacity, as the Secretary of the FDOC. See Order (Doc. 116).

deliberately indifferent to his serious psychiatric needs with respect to his paraphilic disorder.

Before the Court is Defendants' Motion for Summary Judgment (Doc. 219; Motion). As an exhibit, Defendants filed under seal the Expert Witness Report of Rajiv Loungani, MD, MPH (Doc. 219-1; Loungani Report[3]). The Court previously advised Muhammad of the provisions of Federal Rule of Civil Procedure (Rule(s)) 56 and provided him with an opportunity to file a response. See Order (Doc. 11); Summary Judgment Notice (Doc. 220). Muhammad filed a Response (Doc. 254; Response) with several exhibits, some of which he filed under seal (Docs. 254-1 to 254-23, S-258). The Motion is ripe for review.

## II. Muhammad's Allegations

In the SAC, Muhammad alleges that Ogunsanwo and Reimers adopted and enforced "a statewide blanket ban on hormone therapy for psychiatric disorders"; Jones/Inch approved and refused to abolish the "blanket ban"; and Reimers and Jones/Inch intentionally refused to allow a qualified psychologist or psychiatrist to evaluate, diagnose, and treat Muhammad for paraphilic

---

[3] Muhammad also filed a copy of the Loungani Report. See Doc. S-258 at 102-11. Muhammad included an addendum completed by Dr. Loungani that corrects a scrivener's error with respect to the date of the evaluation. See id. at 111. Dr. Loungani evaluated Muhammad on February 28, 2020, not February 28, 2019. See id.

disorder.[4] SAC at 3. He argues that only specially trained psychologists and psychiatrists can diagnose patients with paraphilic disorder; and that this "ban effectively deters prison health staff statewide from hiring psychologists and psychiatrists who are specially qualified" and "[b]ecause of the ban, since at least 2013, there have been minimal prison psychologists and/or psychiatrists statewide who are specially qualified to evaluate patients . . . and none of them have been employed at [Union Correctional Institution (UCI)]." Id. at 7, 9. Muhammad also alleges that "[h]ormone therapy in the form of antiandrogen agents is generally the only psychiatrically recognized, accepted, necessary, and effective treatment for paraphilic disorder." Id. at 7. According to Muhammad, however, due to the "ban," prison staff will not diagnose an inmate with paraphilic disorder "because they will be unable to provide the inmate with the antiandrogen therapy that is clinically determined to be psychiatrically necessary for the inmate's paraphilic disorder." Id. at 9.

Muhammad alleges that from 2014 to at least November 14, 2016, he "repeatedly reported his untreated paraphilic disorder to UCI medical and

---

[4] The evaluation and treatment of Muhammad's condition has been evolving since he filed this case. Muhammad acknowledges that "[i]n 2018 and 2019, Defendants allowed [him] to be diagnosed with paraphilic disorder, but continue to deny [him] the standard of medical care for paraphilic disorders." Doc. 208-1 at 1; see Doc. S-258 at 54-55 (treatment note dated August 8, 2017, assessing Muhammad with paraphilia), 73 (record dated January 11, 2019, noting "new diagnosis added" of "unspec[ified] Paraphilia"), 74-86 (2019 evaluation).

mental health staff," and "repeatedly requested those staff to evaluate him for paraphilic disorder, to diagnose him with paraphilic disorder, and to provide him with psychiatrically recognized, accepted and necessary treatment or antiandrogen therapy for his untreated paraphilic disorder." Id. at 10. Muhammad contends that UCI medical and mental health staff "clinically determined that [Muhammad] had and continued to have a serious psychiatric need to be evaluated," diagnosed, and treated for paraphilic disorder, but "the ban prevented or effectively prevented UCI medical and mental health staff from" doing so. Id. As relief, Muhammad seeks "a permanent injunction against [Inch] as deemed fit by the Court"; "a declaratory judgment against Reimers as deemed fit by the Court"; monetary damages against Jones, Ogunsanwo, and Reimers in their individual capacities; and any other relief to which he is entitled. Id. at 13 (some capitalization omitted).

### III.   Summary Judgment Standard

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only),

4

admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[5] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the

---

[5] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable.

pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Summary judgment is improper, however, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Guevara v. NCL (Bahamas) Ltd., 920 F.3d 710, 720 (11th Cir. 2019) (quotation marks and citation omitted).

## IV. Parties' Positions

Defendants argue that even assuming Muhammad can satisfy the objective prong of a deliberate indifference claim, "he is unable to satisfy the subjective prong" because he cannot show that Defendants' actions amounted to deliberate indifference. Motion at 9. Defendants rely on Dr. Loungani's

Report, arguing that there is "nothing in Dr. Loungani's [R]eport to suggest that the Defendants' conduct amounted to medical treatment that is grossly incompetent, inadequate, or excessive as to shock the conscience." Id. at 11. Defendants further assert that Muhammad has not shown a physical injury, and thus he is not entitled to compensatory or punitive damages. See id. at 12-15.

In his Response, Muhammad contends that Defendants have misconstrued Dr. Loungani's Report. See Response at 12. He recognizes that Dr. Loungani opined that the FDOC followed the standard of care for the initial treatment protocol of his paraphilia; however, Muhammad emphasizes that Dr. Loungani further found that the initial protocol failed and he recommended that Defendants consider proceeding to the next step and provide further treatment. See id. at 12-13. Muhammad also argues that "Defendants' blanket ban . . . prohibits, precludes and prevents medical and psychiatric providers from providing medically necessary antiandrogen treatment for [his] paraphilic disorder," and that "Defendants intentionally denied clinical requests for authorization to treat [Muhammad's] paraphilic disorder with medically necessary antiandrogen treatment." Id. at 14, 17. Finally, as to his requested monetary relief, he cites to a recent Eleventh Circuit opinion that was decided after Defendants filed the Motion and contends that he may

recover punitive damages without showing a physical injury. Id. at 18. Regardless, he asserts that he has shown a physical injury. Id. Accordingly, Muhammad requests the Court deny Defendants' Motion. Id. at 18-19.

## V.    Analysis[6]

"To set out a claim for deliberate indifference to medical need, [the plaintiff] must make three showings: (1) he had a serious medical need; (2) the [defendant] w[as] deliberately indifferent to that need; and (3) the [defendant's] deliberate indifference and [the plaintiff's] injury were causally related. Hinson v. Bias, 927 F.3d 1103, 1121 (11th Cir. 2019); see Nam Dang by & through Vina Dang v. Sheriff, Seminole Cnty. Fla., 871 F.3d 1272, 1279 (11th Cir. 2017) ("To prevail on [a] § 1983 claim for inadequate medical treatment, [the plaintiff] must show (1) a serious medical need; (2) the health care providers' deliberate indifference to that need; and (3) causation between the health care providers' indifference and [the plaintiff's] injury.").[7]

> A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. In the alternative, a serious medical need is determined by

---

[6] For purposes of summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. Thus, the facts described in the Court's analysis may differ from those that ultimately can be proved.

[7] The Eleventh Circuit "has acknowledged that the deliberate indifference standard also applies to inmates' psychiatric or mental health needs." Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (citation omitted).

> whether a delay in treating the need worsens the condition. In either case, the medical need must be one that, if left unattended, poses a substantial risk of serious harm.

Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1307 (11th Cir. 2009) (quotations and citation omitted); see Patel v. Lanier Cnty. Ga., 969 F.3d 1173, 1188 (11th Cir. 2020).

A claim of deliberate indifference to a serious medical need requires "three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003) (citations omitted); see Patel, 969 F.3d at 1188-89 & n.10 (recognizing "a tension within [Eleventh Circuit] precedent regarding the minimum standard for culpability under the deliberate-indifference standard," as some cases have used "more than gross negligence" while others have used "more than mere negligence"; finding, however, that it may be "a distinction without a difference" because "no matter how serious the negligence, conduct that can't fairly be characterized as reckless won't meet the Supreme Court's standard" (citations omitted)). "Subjective knowledge of the risk requires that the defendant be 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Dang, 871 F.3d at 1280

(quoting <u>Caldwell v. Warden, FCI Talladega</u>, 748 F.3d 1090, 1099-1100 (11th Cir. 2014)).

> An official disregards a serious risk by more than mere negligence "when he [or she] knows that an inmate is in serious need of medical care, but he [or she] fails or refuses to obtain medical treatment for the inmate." <u>Lancaster v. Monroe Cnty., Ala.</u>, 116 F.3d 1419, 1425 (11th Cir. 1997), <u>overruled on other grounds by</u> <u>LeFrere v. Quezada</u>, 588 F.3d 1317, 1318 (11th Cir. 2009). Even when medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs. <u>See</u> <u>Harris v. Coweta Cnty.</u>, 21 F.3d 388, 393-94 (11th Cir. 1994) (citing <u>Brown v. Hughes</u>, 894 F.2d 1533, 1537-39 (11th Cir. 1990)).[8] Further, "medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." <u>Mandel v. Doe</u>, 888 F.2d 783, 789 (11th Cir. 1989) (citations omitted). However, medical treatment violates the Constitution only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." <u>Rogers v. Evans</u>, 792 F.2d 1052, 1058 (11th Cir. 1986) (citation omitted).

---

[8] "Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." <u>McElligott v. Foley</u>, 182 F.3d 1248, 1255 (11th Cir. 1999) (citation omitted). However, "[i]t is also true that when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." <u>Waldrop v. Evans</u>, 871 F.2d 1030, 1035 (11th Cir. 1989) (citing <u>Hamm v. DeKalb Cnty.</u>, 774 F.2d 1567, 1575 (11th Cir. 1985)); <u>see</u> <u>Boone v. Gaxiola</u>, 665 F. App'x 772, 774 (11th Cir. 2016).

Dang, 871 F.3d at 1280 (some internal citations modified). "'[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. Each individual defendant must be judged separately and on the basis of what that person kn[ew].'" Id. (quoting Burnette v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2008)).

Defendants rely on Dr. Loungani's Report which includes the following assessment and recommendations:

> Inmate appears to in fact have paraphilic disorders – both coercive and pedophilic disorders.
> -**Standard of Care appears to have been followed** for initial medication treatment algorithm steps: Selective serotonin reuptake inhibitors (SSRIs) and neuroleptics/antipsychotic medications attempted.
> -Consider raising Zoloft (sertraline) dose to as high as 300mg if tolerated, cross-titrate back to Prozac (fluoxetine, which has evidence in the literature for treating paraphilic coercive disorder), or to an alternative antidepressant such as Luvox (fluvoxamine), Anafranil (clomipramine), or Norpramin (desipramine), or neuroleptic such as Abilify (aripiprazole) or Rexult (brexpiprazole), for Obsessive-Compulsive Disorder and Paraphilic disorders.
> -ReVia (naltrexone), Remeron (mirtazapine), antipsychotics (e.g. fluphenazine), mood stabilizers (e.g. Lithium carbonate, carbamazepine, topiramate) also have been used sporadically in various studies, with low level of efficacy shown.
> -Consider proceeding to next step(s) in treatment algorithm of paraphilias: add anti-androgen to SSRI, such as **Medroxyprogesterone acetate**

**(MPA),**[9] **Cyproterone acetate (CPA), GnRH analogues (e.g. Triptorelin, Leuprorelin, Gosrelin)**, all of which have been found to reduce sex drive, deviant sexual behavior and fantasies in males as early as within weeks; Depo-Prover[a], given lack of effectiveness with antidepressants and neuroleptics attempted thus far, plus moderate risk of sexual violence toward female staff/guards.

-Psychotherapy – supportive, cognitive-behavioral, insight-oriented/psychodynamic, mindfulness-based, empathy training, sexual impulse control training, relapse prevention, biofeedback, motivational interviewing.

Continue Psychoeducation to help inmate understand links between his cognitions, feelings, physiological responses, and actions; distraction techniques and other coping skills when overwhelmed.

-Assign male treatment providers (prescribers and therapist) if possible, and limit exposure to female staff and guards. This is both for inmate's benefit, as well as for the staff's safety.

-Monitor Suicidal Ideation/Intent/Plan and Sexual risk of acting out with female staff and guards.

-Tests: Psychiatric labs to rule out psychiatric symptoms due to general medical conditions. MRI Brain with and without contrast to evaluate for neurological lesions, given history of at least three head injuries with loss of consciousness.

-Bilateral orchidectomy (surgical castration) is a last resort for serial sex offenders, after all alternative[s] and less invasive treatment utilized, if legal in the state of Florida under such conditions.

Loungani Report at 9-10 (emphasis in original).

---

[9] "Medroxyprogesterone Acetate is the generic name of Depo-Provera." Doc. 254-14 at 6.

Defendants assume for purposes of their Motion that Muhammad has a serious medical need, thus satisfying the objective component of a deliberate indifference claim. See Motion at 9. As to the subjective component, Defendants rely on Dr. Loungani's Report and assert that they "did nothing wrong." Id. at 11. According to Defendants, while Muhammad avers in his SAC "that hormone therapy or anti-androgen therapy is the **only** psychiatrically recognized treatment for paraphilic disorders," Dr. Loungani opined that there are various other treatment options. Id. at 10 (emphasis in original). Defendants assert that although Dr. Loungani "listed supplemental treatment options, including anti-androgen therapy," Muhammad "is not entitled to the best, most expensive treatment available." Id. at 11. They conclude that Muhammad "is merely upset that the Defendants are not provid[ing] the treatment he wants." Id.

Muhammad argues that "Defendants' blanket ban that prohibits, precludes and prevents medical and psychiatric providers from providing medically necessary antiandrogen treatment for [Muhammad's] paraphilic disorder" results in deliberate indifference to his serious psychiatric needs. Response at 14; see also SAC at 3. He relies, in part, on the Eleventh Circuit's

decision in <u>Keohane v. Fla. Dep't of Corr.</u>, 952 F.3d 1257 (11th Cir. 2020).[10] In

<u>Keohane</u>, a transgender female inmate sued the Secretary of the FDOC

asserting, in relevant part, that the FDOC's refusal to accommodate her social-

transitioning requests violated her Eighth Amendment rights. Like here, the

dispute centered on the subjective component. <u>Id.</u> at 1273-74. The Eleventh

Circuit found no Eighth Amendment violation for two main reasons: (1) "the

testifying medical professionals were—and remain—divided over whether

social transitioning is medically necessary to [the plaintiff's] gender-dysphoria

treatment" and (2) the FDOC "denied [the plaintiff's] social-transitioning-

related requests, at least in part, on the ground that they presented serious

security concerns." <u>Id.</u> at 1274-75. Relevant to this Court's consideration of

Muhammad's claim, the Eleventh Circuit reasoned:

> At worst, then, this is a situation where medical
> professionals disagree as to the proper course of
> treatment for [the plaintiff's] gender dysphoria, and
> it's well established that "a simple difference in
> medical opinion between the prison's medical staff and
> the inmate as to the latter's diagnosis or course of
> treatment [cannot] support a claim of cruel and
> unusual punishment." <u>Harris v. Thigpen</u>, 941 F.2d
> 1495, 1505 (11th Cir. 1991); <u>Waldrop v. Evans</u>, 871
> F.2d 1030, 1033 (11th Cir. 1989); <u>accord, e.g.</u>, <u>Lamb v.</u>
> <u>Norwood</u>, 899 F.3d 1159, 1163 (10th Cir. 2018)
> (holding that "disagreement alone" does not constitute

---

[10] The appeal came before the Eleventh Circuit after a bench trial in the United States District Court for the Northern District of Florida. <u>See</u> <u>Keohane v. Jones</u>, 328 F. Supp. 3d 1288 (N.D. Fla. 2018), <u>vacated sub nom.</u> <u>Keohane</u>, 952 F.3d at 1257.

deliberate indifference); <u>Kosilek v. Spencer</u>, 774 F.3d 63, 90 (1st Cir. 2014) ("The law is clear that where two alternative courses of medical treatment exist, and both alleviate negative effects within the boundaries of modern medicine, it is not the place of our court to second guess medical judgments or to require that the [F]DOC adopt the more compassionate of two adequate options." (quotation omitted)). Put simply, when the medical community can't agree on the appropriate course of care, there is simply no legal basis for concluding that the treatment provided is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." <u>Harris</u>, 941 F.2d at 1505 (quotation omitted). Here, therefore, implementing the course of treatment recommended by [the plaintiff's] FD[O]C medical team, and seconded by a number of other medical professionals, isn't "so unconscionable as to fall below society's minimum standards of decency"—and thus violative of the Eighth Amendment—merely because it conflicts with the opinion of [the plaintiff's] retained expert. <u>Kosilek</u>, 774 F.3d at 96.

<u>Keohane</u>, 952 F.3d at 1274-75 (internal citations modified and footnotes omitted).

Here, in his Report, Dr. Loungani explicitly found that the FDOC followed the standard of care for the "initial medication treatment algorithm steps," and he recommended considering the addition of an anti-androgen medication as one treatment option. However, Dr. Loungani did not find that anti-androgen therapy is the only treatment option. Indeed, Dr. Loungani also recommended certain medications, psychotherapy, psychoeducation, limiting

contact with females, monitoring Muhammad's suicidal ideation, and conducting certain tests. It follows that Dr. Loungani did not find that Depo-Provera or other anti-androgen therapy is medically necessary to treat Muhammad's paraphilia. Thus, even assuming Defendants were responsible for a blanket ban on treating paraphilias with anti-androgen therapy, such therapy, at least according to Dr. Loungani, is not medically necessary to treat Muhammad's condition. And Muhammad presents no evidence that anti-androgen therapy was the sole proper treatment for his paraphilia. Therefore, there exists no basis to hold Defendants liable under the Eighth Amendment.

This is further confirmed by the evidence Muhammad submitted, which shows that there is no consensus among medical professionals that anti-androgen therapy is medically necessary for the treatment of Muhammad's paraphilia. A summary of that evidence follows.

On July 2, 2018, Defendant Reimers responded to Muhammad's second set of interrogatories and advised that "[i]ndividual and/or group therapy is generally the accepted practice of treatment" for paraphilic disorders. Doc. 254-15 at 2-3.[11] Defendant Reimers clarified that "the general course of treatment differs from patient to patient, and there is no single 'cure' that fits all individuals. Treatment must be tailored to the specific concerns of individual

_____

[11] See Doc. 254-3 (Reimers' curriculum vitae).

patients." Id. at 3. He further advised that "Depo-Provera is not . . . indicated by the Food and Drug Administration as being used to treat paraphilic disorders. Additionally, [p]araphilic disorders is a category label not a specific diagnosis, therefore no treatment is specified for a category." Id.; see also id. at 4 ("Depo-Provera is not an indicated course of treatment to treat paraphilic disorders according to the FDA, and as a result, is not generally proscribed [sic] to treat such issues."). Finally, Defendant Reimers declared that "[t]here is no blanket ban on Depo-Provera as it is part of FDOC's formulary." Id. at 4.[12]

Also on July 2, 2018, Defendant Reimers responded to Muhammad's first set of interrogatories that asked for a detailed explanation of Defendants Ogunsanwo, Reimers, and the FDOC's policy or practice relating to the use of hormone treatment for psychiatric disorders such as paraphilic disorders and gender identity disorder. See Doc. 254-16 at 2. Defendant Reimers objected to the relevance of any information related to gender identity disorder, but otherwise responded:

> Health Services Bulletin [(HSB]] 15.05.03 describes the policies of the [FDOC] regarding treatment of paraphilic disorders. The Policy is summarized as the evaluation and referral process and general outline of treatment. However, the course of treatment is

---

[12] One year prior, in June 2017, the FDOC had four medications on its formulary that the Generic Product Identifier system classified as anti-androgen: Bicalutamide, Enzalutamide, Flutamide, and Nilutamide. Doc. 254-20 at 3. The FDOC apparently added Depo-Provera sometime thereafter.

> ultimately to be determined by the treating doctor,
> and this policy acts a[s] guidelines in determining that
> course.

Id. at 3; see Doc. 254-17 (HSB 15.05.03).

Additionally, on several occasions in February and March 2019, A. McCaw, M.A., a psychology intern, under the supervision of T. Culbreath, Psy.D., a licensed psychologist, evaluated Muhammad at Zephyrhills Correctional Institution. See Doc. S-258 at 74-86. McCaw and Dr. Culbreath diagnosed Muhammad with unspecified paraphilic disorder, among other diagnoses. Id. at 83. The two made various treatment recommendations, such as housing Muhammad within the inpatient Transitional Care Unit, assigning male therapists if possible, obtaining a psychiatric consultation to consider restarting an SSRI in conjunction with medical staff to address any medical side effects, engaging in psychoeducation, and utilizing cognitive behavior interventions. See id. at 83, 85. They did not include any recommendation for anti-androgen therapy.

Perhaps the best piece of evidence for Muhammad is an April 30, 2019 order written by M. Thomas, APRN, prescribing medroxyprogesterone (Depo-Provera) for Muhammad. Id. at 88-89.[13] On May 3, 2019, John P. Lay, Jr., M.D.,

---

[13] See also Doc. 254-10 at 3-4 (interrogatory responses by Dr. Nicole Knox, Psy.D., on behalf of Defendant Inch, dated April 23, 2019, stating: "Any consideration of prescribed medication would be contingent upon the results of the psychiatric evaluation. [Muhammad] has been

approved the Drug Exception Request for medroxyprogesterone, id. at 90;
however, a note written by APRN Thomas on May 14, 2019, reflects that the
"order for Depo" was discontinued and that "this is a medication used for a
DSM-5 diagnosis," id. at 92.[14]

On June 5, 2019, on behalf of Defendant Inch, Johnathan Greenfield,
M.D., Associate Statewide Psychiatric Director for the FDOC/Centurion,
averred that:

> There are no current psychiatrically recognized,
> accepted, and appropriate pharmacologic treatments
> of paraphilic disorders. The current psychiatrically
> recognized and accepted treatment of paraphilic
> disorders focuses on an overall comprehensive
> treatment involving psychotherapy and behavioral
> therapy and may involve pharmacologic interventions
> which attempt to address and ameliorate the
> symptoms associated with any risk of sexual violence
> due to paraphilic behaviors and impairment in
> functionality.

approved for possible prescription of [D]epo-[P]rovera, and treatment would follow
thereafter.")

[14] Muhammad blames Defendant Inch for the discontinuation of the Depo-Provera treatment,
arguing that "Inch is not a medical professional and is not trained in the management of
medical care." Response at 18 ("[O]n 5-14-19, Inch ordered medical professionals to
discontinue [Muhammad's] treatment with Depo-Provera; (treatment that Inch approved on
4-23-19)."). Muhammad, however, has not presented any evidence that Defendant Inch, who
is sued in his official capacity only, was responsible for the decision to cancel the treatment
order. In Muhammad's Affidavit, he avers that Dr. H. Johnson and Dr. S. Boyce told him
"that medical and mental health staff at [Zephyrhills Correctional Institution] didn't have
anything to do with Central Office – FD[O]C cancelling the approval to use Depo-Provera to
treat [his] paraphilia." Doc. S-258 at 16. Muhammad continued, "In Oct[ober] 2019, Dr.
Thomas told me that Dr. Amaccuci [(the Regional Medical Director)] ordered her to
discontinue [the] Depo-Provera on 5-14-19, and that she didn't like or agree with that order."
Id.

Doc. 254-14 at 4.

On January 29, 2020, Psychiatric Nurse Practitioner A. Napoli evaluated Muhammad and noted that he reported "some improvement in symptoms however [he] continues to have issues with inappropriate and violent sexual ideations." Doc. S-258 at 93. Napoli planned to "consider options for treatment of paraphilia." Id. at 94. On March 4, 2020, Muhammad reported to Napoli that the "current dose of Zoloft [was] not helping with [his] paraphilia" and he requested an increased dose. Id. at 95. Napoli noted Muhammad's "great concern about [his] inability to control [his] paraphilia symptoms," and Napoli planned to "consult with Dr[s]. Greenfield [and] Pages." Id. at 96. On May 12, 2020, Napoli noted: Muhammad "states that sexual/homicidal urges have been especially bothersome today which has him distressed. These thoughts are directed at all women present on the quad including this provider." Id. at 97. She further indicated that Muhammad "does not participate in group therapy due to paraphilic urges. [Muhammad] currently undertaking legal remedy as medications requested for paraphilia have been denied." Id. at 98.

On March 2, 2021, Psychiatrist C. Lim evaluated Muhammad. Id. at 99-100.[15] Dr. Lim noted that Muhammad reported he was "[b]etter [with] Prozac," and he requested the same dose. Id. at 99. Dr. Lim wrote: "Lot of time spent on [Muhammad's] demand for [D]epo[] Provera. This has been discussed several [times with] D[rs.] Greenfield [and] Taylor [and] Request Denied as discussed."[16] Id. at 100.

In April 2021, Muhammad submitted an inmate request asking why Dr. Greenfield denied psychiatry's repeated requests for approval to treat him with Depo-Provera. Id. at 101. The Director of Psychological Services at Suwannee Correctional Institution responded: "On 08/03/2020 you received a response from Dr. Greenfield[:] 'All DERs [(Drug Exception Requests)] are determined in full compliance with the Florida DOC policies and procedures, using as guidelines the most currently approved edition of the Physician Desk Reference.'" Id. at 101.

Muhammad also filed as exhibits several publications. See Docs. 254-8, 254-9, 254-11, 254-12, 254-13. Notably, one of the publications authored in

---

[15] Some of Dr. Lim's notes are illegible. See Doc. S-258 at 99-100.

[16] In Muhammad's Affidavit, he interprets this note as follows: "Depo-Provera . . . has been discussed several [times with] Dr. Greenfield [and] Dr. Taylor. [Our] Request [for Depo-Provera] denied. . . ." Doc. S-258 at 16-17.

2010 proposed an algorithm of pharmacological treatment for paraphilias. See

Doc. 254-8. The algorithm consisted of the following six levels:

| LEVEL 1 | |
|---|---|
| • Aim: control of paraphiliac sexual fantasies, compulsions and behaviours without impact on conventional sexual activity and on sexual desire | • Psychotherapy (preferentially cognitive behavioural therapy if available (Level C), no level of evidence for other forms of psychotherapy) |
| **LEVEL 2** | |
| • Aim: control of paraphiliac sexual fantasies, compulsions and behaviours with minor impact on conventional sexual activity and on sexual desire<br>• May be used in all mild cases ("hands off" paraphilias with low risk of sexual violence, i.e. exhibitionism without any risk of rape or paedophilia)<br>• No satisfactory results at level 1 | • SSRIs: increase the dosage at the same level as prescribed in OCD (e.g., fluoxetine 40-60 mg/day or paroxetine 40 mg/day (Level C) |
| **LEVEL 3** | |
| • Aim: control of paraphiliac sexual fantasies, compulsions and behaviours with a moderate reduction of conventional sexual activity and sexual desire<br>• 'Hands on' paraphilias with fondling but without penetration<br>• Paraphiliac sexual fantasies without sexual sadism<br>• No satisfactory results at level 2 after 4-6 weeks of SSRIs at high dosages | • Add a low dose antiandrogen (e.g., cyproterone acetate 50-100 mg/day) to SSRIs (Level D) |

| **LEVEL 4** | |
|---|---|
| • Aim: control of paraphiliac sexual fantasies, compulsions and behaviours with a substantial reduction of sexual activity and desire<br>• Moderate and high risk of sexual violence (severe paraphilias with more intrusive fondling with limited number of victims)<br>• No sexual sadism fantasies and/or behaviour (if present: go to level 5)<br>• Compliant patient, if not: use i.m. form or go to level 5<br>• No satisfactory results at level 3 | • First choice: full dosage of cyproterone acetate (CPA): oral, 200-300 mg/day or i.m. 200-400 mg once weekly or every 2 weeks; or use medroxyprogesterone acetate: 50-300 mg/day if CPA is not available (Level C)<br>• If co-morbidity with anxiety, depressive or obsessive compulsive symptoms, SSRI's might be associated with cyproterone acetate |
| **LEVEL 5** | |
| • Aim: control of paraphiliac sexual fantasies, compulsions and behaviours with an almost complete suppression of sexual desire and activity<br>• High risk of sexual violence and severe paraphilias<br>• Sexual sadism fantasies and/or behaviour or physical violence<br>• No compliance or no satisfactory results at level 4 | • Long acting GnRH agonists, i.e. triptorelin or leuprolide acetate 3 mg/month or 11,25 mg i.m. every 3 months (Level C)<br>• Testosterone levels measurements may be easily used to control the GnRH agonist treatment observance if necessary<br>• Cyproterone acetate may be associated with GnRH agonist treatment (one week before and during the first month of GNRHa) to prevent a flare up effect and to control the relapse risk of deviant sexual behaviour associated with the flare up effect |
| **LEVEL 6** | |
| • Aim: control of paraphiliac sexual fantasies, compulsions and behaviours with a complete | • Use antiandrogen treatment, i.e. cyproterone acetate (50-200 mg/day per os or 200-400 mg once weekly |

| | |
|---|---|
| suppression of sexual desire and activity<br>• Most severe paraphilias (catastrophic cases)<br>• No satisfactory results at level 5 | or every 2 weeks i.m.) or, medroxyprogesterone acetate (300-500 mg/week i.m. if CPA not available) in addition to GnRH agonists (Level D)<br>• SSRIs may also be added (No level of evidence) |

Doc. 254-8 at 44; see also Doc. 254-9 at 5 (article published in 2016 recognizing those six levels of treatment were developed prior to the publication of the DSM-5 but finding they "remain useful because the algorithm is based on the severity of impairment and risk of harm").

Even viewing the evidence and making all reasonable inferences in favor of Muhammad, at most, the evidence shows a difference of opinion between medical professionals and Muhammad, which cannot support an Eighth Amendment deliberate indifference claim. See, e.g., Keohane, 952 F.3d at 1274-75; Harris, 941 F.2d at 1505 ("Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment."). Indeed, while some medical professionals and Muhammad apparently believe Muhammad should be treated with Depo-Provera, other medical professionals have not recommended such treatment. Compare Doc. S-258 at 88-89 (April 30, 2019 order for Depo-Provera), with id. at 74-86 (report authored by McCaw and Culbreath); see also Loungani Report at 9-10

(recommending various treatment options, one of which includes anti-androgen therapy). Notably, Muhammad avers that Drs. Napoli, Cunningham, Lim, and Cannon told Muhammad that his "paraphilia needs to be treated with Depo-Provera" but Dr. Greenfield has denied their requests "because FD[O]C prohibits the use of antiandrogens to treat paraphilia." Doc. S-258 at 16 (citing id. at 93-100). However, the medical records Muhammad cites do not support that proposition. Napoli's treatment notes do not show that she requested Muhammad be treated with Depo-Provera, see id. at 93-98, and Dr. Lim's note indicates that Muhammad was "demand[ing]" treatment with Depo-Provera, id. at 100.

The record reveals there is no consensus that Muhammad's condition requires anti-androgen therapy.[17] There also is no consensus on the course of treatment for Muhammad's condition. Nevertheless, this is not a case where no treatment is being given or the treatment is so cursory as to amount to no treatment at all. The records reflect that the FDOC has been evaluating and treating Muhammad's condition over the course of several years, and it

---

[17] On April 19, 2021, the Court denied Muhammad's request for an order appointing an expert witness psychiatrist who specializes in paraphilic disorders (such as Dr. Fred Berlin) or alternatively, an order appointing counsel to assist Muhammad in obtaining an expert opinion from Dr. Berlin. See Order (Doc. 239); see also Order (Doc. 248) (denying motion for reconsideration). Even assuming Muhammad obtained an expert report opining that his condition required anti-androgen therapy, the Court's ruling on Defendants' Motion would not change. There would remain a difference of opinion among medical professionals about whether Muhammad required such treatment.

continues to do so. <u>See</u> Doc. S-258 at 93-100 (psychiatric follow-up notes dated January 2020 through March 2021); <u>see also</u> <u>id.</u> at 70 (grievance response from G. Espino, M.D. dated July 11, 2018: "We have discussed this extensively. We have offered you group therapy, individual [t]herapy, and Psychotropic medication to address your treatment needs. The anti-androgens <u>you have been requesting</u> have been denied by our state Psychiatrist and state Mental Health Director." (emphasis added)). In sum, Muhammad is receiving care for his paraphilia, and "[t]he long and short of it is that diagnosing, monitoring, and managing conditions—even where a complete cure may be available—will often meet the 'minimally adequate medical care' standard that the Eighth Amendment imposes." <u>Hoffer v. Sec'y, Fla. Dep't of Corr.</u>, 973 F.3d 1263, 1273 (11th Cir. 2020) (quoting <u>Harris</u>, 941 F.2d at 1504).

Moreover, Muhammad's contention that HSB 15.05.03 "prohibits, prevents and precludes medical and psychiatric providers from treating paraphilic disorders with medically necessary antiandrogen treatment," Response at 5-6, reads language into the HSB that is not present. The HSB provides guidelines, but it does not preclude a treating doctor from prescribing an appropriate course of treatment based on an individual inmate's needs. <u>See</u> Doc. 254-16 at 2 (Reimers averring that "the course of treatment is ultimately to be determined by the treating doctor, and [HSB 15.05.03] acts a[s] guidelines

in determining that course"). Additionally, the alleged "blanket ban" is distinguishable from the policy challenged in <u>Keohane</u> to which Muhammad cites. <u>See</u> Response at 14. In <u>Keohane</u>, the plaintiff alleged that the challenged policy "amounted to a per se rejection of any treatment that an inmate hadn't received prior to her incarceration, without regard to (or any exception for) medical necessity." <u>Keohane</u>, 952 F.3d at 1266. While the Eleventh Circuit did not reach the merits of the issue (it instead found the issue to be moot), the Court stated: "Were we free to reach the merits, we would almost certainly agree [with the plaintiff]. . . . It seems to us that responding to an inmate's acknowledged medical need with what amounts to a shoulder-shrugging refusal even to consider whether a particular course of treatment is appropriate is the very definition of 'deliberate indifference'—anti-medicine, if you will." <u>Id.</u> at 1266-67. Here, however, the evidence shows that the FDOC evaluated and monitored Muhammad's condition, considered his requests for anti-androgen therapy, and provided him with various treatments. At one point, FDOC medical personnel ordered Depo-Provera for Muhammad, but that order was subsequently canceled. The reasoning for that cancelation is unclear. One reason given was because Depo-Provera is used for DSM-5 diagnoses. However, this rationale appears contrary to Defendant Inch's April 23, 2019 amended response to Muhammad's second set of interrogatories, in

which Dr. Knox, on behalf of Defendant Inch, stated that "[p]araphilia is a psychologically and psychiatrically recognized Mental disorder defined within the DSM-V and ICD-10 codes." Doc. 254-14 at 2. Another reason may have been that Depo-Provera is not FDA approved as a treatment for paraphilia. See Doc. 254-15 at 3, 4. Or, other FDOC medical professionals may have determined that anti-androgen treatment was not medically necessary for Muhammad's paraphilia. Regardless, the bottom line is that there is no consensus on the appropriate course of treatment for Muhammad's paraphilia, the FDOC has at least considered whether Depo-Provera is appropriate for him, and the FDOC is monitoring and treating Muhammad's condition. While the adequacy of Muhammad's care may be the "subject of genuine, good-faith disagreement between healthcare professionals," there is no evidence to suggest that Defendants "acted in so reckless and conscience-shocking a manner as to have violated the Constitution." Hoffer, 973 F.3d at 1273.

Considering the record, the Court finds that Defendants are entitled to entry of summary judgment in their favor. Accordingly, it is

**ORDERED**:

1.    Defendants' Motion for Summary Judgment (Doc. 219) is **GRANTED**.

2.     The **Clerk** shall enter judgment in favor of Defendants and against Plaintiff, terminate any pending motions, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 8th day of September, 2021.



**MARCIA MORALES HOWARD**
United States District Judge



JAX-3 9/8
c:
Akeem Muhammad, #706732
Counsel of Record